Filed 4/18/14  P. v. Kincaid CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048359 |
| v. | (Super. Ct. No. 09WF1991) |
| JOHNATHAN ALLEN KINCAID, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, William R. Froeberg, Judge.  Affirmed.

Michelle May Peterson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Johnathan Allen Kincaid of first degree felony murder (Pen. Code, § 187, subd. (a); all further statutory references are to this code). The jury found the murder was committed during the commission of a robbery (§ 190.2, subd. (a)(17)(A)) and that defendant personally used a deadly weapon during the commission of the murder (§ 12022, subd. (b)(1)). The trial court found true two strike priors. The court sentenced him to six years in state prison, plus life without the possibility of parole.

Defendant appeals, contending the court erred in failing to suppress his statement to the police following his arrest as violating his invocation of his right to remain silent. We agree this was error but nevertheless affirm the conviction as the error was harmless. He also contends the court erred by failing to instruct on voluntary manslaughter. We disagree with this contention and affirm the judgment.

FACTS

*1. The murder*

Tayroh Stinson was a marijuana merchant. He preferred to sell marijuana from his car because he felt this was safer. He also handled marijuana transactions for his friend Lee Walker. Early in the afternoon, Walker received a call from defendant and passed his phone to Stinson. Defendant stated he wished to purchase an ounce of marijuana for $300. Stinson and defendant agreed to meet at a Mae's Café to effect the sale. Stinson's friend Jermaine Bradley accompanied Stinson to this planned encounter.

In the Mae's Café parking lot, defendant approached and, on Stinson's invitation, entered Stinson's car. Defendant then directed Stinson to drive across the street and park in the visitor's parking area of a condominium complex. He then told Stinson to get out of the car and to go into the garage. Bradley testified Stinson would not normally get out of the car to conduct his marijuana sales. When Stinson did not

2

return after 10 minutes or so, Bradley tried to phone him but got no answer. He then got out of the car, walked in the direction Stinson had gone, and saw police and a body on the ground. Jason Moreno, who was seated near a window at Mae's Café, saw Stinson stagger and fall down. Another customer at Mae's Café, Carlos Herrera, saw two men running, one Black being chased by a White person, and then saw both of them fall into the bushes. The Black person fell first. Herrera saw the White man with a large knife. Shortly thereafter, the police arrived.

Stinson suffered stab wounds, one fatal. He was found to have carried $1,173 cash and marijuana on his person. Defendant's DNA was found in the victim's car.

After the murder, defendant was next seen by Jeffery McDonald, Jr., his cousin. McDonald testified defendant seemed "upset, kind of somewhat frantic, or excited" and stated "he had gotten jumped or something like that." Trisha Palmer, McDonald's girlfriend, was in her car when defendant entered the vehicle and told her he needed a ride. As Palmer drove defendant asked her to take him to Santa Ana. Defendant said "he tried to rob them and it went bad, so he took them all the way." Palmer then told defendant to get out of her car.

McDonald saw defendant again later that evening. Defendant told him he had stabbed someone because the victim refused to give him drugs. Defendant also admitted having stabbed someone to his friend Bryan Arroyo, when he asked the latter for help to get out of town.

Defendant was eventually arrested in Las Vegas where he was interviewed by Garden Grove detectives. After his arrest, defendant called Palmer twice and threatened her.

## 2. *The police interrogation*

During the interview, which took place after defendant had been advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (*Miranda*), defendant essentially denied knowing anything about the crime. During the interview, defendant stated many times "I'm done talking" or words to that effect, but the inquiring officers ignored his statement. Four of these statements took place during the portion of the interview that was presented to the jury. The trial court excluded the remainder of the interview.

Specifically, the following exchanges took place during the portion of the interview that was given to the jury: Detective: "And I know you know what I'm talking about." [¶] Defendant: "I don't know shit." [¶] Detective: "You know what? You do." [¶] Defendant: "I'm done talking." [¶] Detective: "Well something happened. . . ." The interrogation continued.

Later, a detective stated, "That's where we don't think that you're being truthful with us. And if there was a reason that this happened the way it did, we want to hear it from you. Otherwise there's no explanation for what happened." Defendant responded, "I don't – I don't know what the fuck you guys are talking about. I really don't. And I'm done talking." The detective said, "We're not done asking questions though. . . ." The detective continued questioning defendant.

On a third occasion, a detective asked, "Say again?" Defendant responded, "I said what is this – like what the fuck? Are we done?" The detective said, "No." Defendant responded, "I'm done." The detective stated, "We want the truth from you . . . ." The interrogation continued.

Finally, defendant stated, "I don't know who Brian is so I don't – I wouldn't be able to tell you that" and "I told you I'm done talking. I don't know about

4

none of this shit and I need to use the restroom real bad." Nonetheless, the interrogation continued.

DISCUSSION

*1. The interrogation violated defendant's Miranda rights.*

As noted in *Miranda*: "if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." (*Miranda*, *supra*, 384 U.S. at p. 445.) As the Attorney General recognizes, "No particular form of words or conduct is necessary on the part of a suspect in order to invoke his or her right to remain silent." (*People v. Crittenden* (1994) 9 Cal.4th 83, 129.)

To stop the questioning, "the suspect 'must articulate his desire to [remain silent] sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [an invocation of the right to remain silent].'" (*People v. Thomas* (2012) 211 Cal.App.4th 987, 1005.) "'If the suspect's response is unequivocal and unambiguous, the interrogation must stop. Police may not seek clarification of a suspect's response in an attempt to change the suspect's mind after an invocation of *Miranda* rights. [Citation.] Nor may police continue with the interrogation in an attempt to confuse a suspect about the nature of his constitutional rights.'" (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 214.) The statements made by defendant were sufficiently unequivocal to impose a duty on the officers to terminate the questioning.

Relying on *People v. Musselwhite* (1998) 17 Cal.4th 1216 and similar cases, the Attorney General contends that statements such as "I'm done talking," and

5

"I'm done," do not unambiguously indicate invocation of a right to remain silent. But in *Musselwhite*, the defendant's statement was limited to "'I don't want to talk about this. You all are getting me confused.'" (*Id.* at p. 1239, italics omitted.) Here, defendant repeatedly made unequivocal and unambiguous statements that he was "done talking." The court erred in admitting the statements following his invocation of the right to be silent.

*2. The error was harmless.*

But we do agree with the Attorney General that the error in admitting the statements was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].)

The statements admitted into evidence were not inculpatory; the only use the prosecutor made of the statements during closing argument was to argue that they demonstrated defendant was not truthful. And the evidence of defendant's guilt in killing Stinson in the course of the robbery was overwhelming. As Palmer drove defendant, he told her "[h]e tried to rob them and it went bad, so he took them all the way." Defendant told McDonald he had stabbed someone because the victim refused to give him drugs. Defendant also admitted having stabbed someone to Arroyo. After his arrest, defendant called Palmer twice and threatened her. Acquaintances of the victim testified the latter did not want to conduct drug deals except in his car; defendant persuaded him to get out of the car. Eye witnesses saw defendant chase the victim. And defendant came prepared for the robbery with a large knife. Finally, defendant fled the scene of the incident and later fled to Las Vegas.

*3. The court did not err in failing to instruct on voluntary manslaughter.*

Defendant was convicted under the felony-murder rule. "[I]n *People v. Dillon* (1983) 34 Cal.3d 441[], the court noted that in a felony-murder prosecution, the defendant is not permitted to offer any proof at all that he acted without malice. [Citation.] The court explained: 'In Wigmore's words, the issue of malice is therefore "wholly immaterial for the purpose of the proponent's case" when the charge is felony murder. In that event . . . as a matter of law malice is not an element of felony murder.' [Citation.] As the court concluded, '". . . malice aforethought is not an element of murder under the felony-murder doctrine."' [Citation.] [¶] Regarding the doctrine of imperfect self-defense, '. . . when the trier of fact finds that a defendant killed another person because the defendant actually, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.' [Citation.] Because malice is irrelevant in . . . felony-murder prosecutions, a claim of imperfect self-defense, offered to negate malice, is likewise irrelevant." (*People v. Tabios* (1998) 67 Cal.App.4th 1, 8, italics omitted, disapproved on another point in *People v. Chun* (2009) 45 Cal.4th 1172, 1197.)

We therefore agree defendant was not entitled to an instruction on voluntary manslaughter. In addition, an instruction on a lesser included offense is only required where the evidence would support conviction on such a theory. (*People v. Souza* (2012) 54 Cal.4th 90, 114-115.) Here, the only evidence points to a preplanned intention to rob Stinson of his drugs. There is no interpretation one could place on the evidence to conclude defendant was guilty of voluntary manslaughter. This also explains defense counsel's agreement the court should not instruct on voluntary manslaughter.

DISPOSITION

The judgment is affirmed.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

MOORE, J.

THOMPSON, J.

8